IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

JASON L. EKSTER,
    Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,
    Defendant.

Case No. 1:14-cv-01396-JEH

**Order and Opinion**

Now before the Court is the Plaintiff's Jason L. Ekster's Motion for Summary Judgment (Doc. 18) and the Commissioner's Motion for Summary Affirmance (Doc. 22). For the reasons stated herein, the Court DENIES the Plaintiff's Motion for Summary Judgment and GRANTS the Defendant's Motion for Summary Affirmance.[1]

**I**

In February 2012, Ekster filed applications for disability insurance benefits and supplemental security income (SSI) alleging disability beginning October 16, 2004. His claim for SSI was denied initially on May 16, 2012, and was denied upon reconsideration on August 14, 2012.[2] On August 24, 2012, Ekster filed a request for hearing concerning his application for Social Security benefits. A hearing was held before the Honorable Diane Raese Flebbe (ALJ) on April 16, 2013, and at that time Ekster was not represented by an attorney or an official

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 12) on the docket.
[2] In the ALJ's May 3, 2013 Decision, the ALJ determined that Ekster did not have a severe impairment or combination of impairments prior to December 31, 2004 (his date last insured), and so he was not entitled to disability insurance benefits. Ekster does not challenge that determination, and so the Court will limit its consideration to the part of the ALJ's Decision he does challenge – the denial of SSI.

representative. Following the hearing, Ekster's claim was denied on May 3, 2013. His request for review by the Appeals Council was denied on August 21, 2014, making the ALJ's Decision the final decision of the Commissioner. Ekster filed the instant civil action seeking review of the ALJ's Decision on September 30, 2014.

## II

At the time he applied for benefits, Ekster was 36 years old living in Peoria Heights, Illinois. At the time of the hearing before the ALJ, Ekster was living with a friend and the friend's family at their house. Ekster had a girlfriend with whom he was for 11 or 12 years, and they had a 10-year-old son together. His girlfriend lived with her son and her mother. Ekster was able to see his son "[w]hen he want[ed] to come out," and Ekster would take his son to the park and try to get him to play sports. AR 55. He had previously been incarcerated and his past work included mowing lawns, collecting bills by telephone, working at McDonald's, working at Wal-Mart, working at Olive Garden, and working at a cemetery. He had attended college, but he did not finish his degree. On his Form SSA-3368, Ekster provided that severe anxiety – panic attacks – bipolar disorder, gout, and high blood pressure limited his ability to work.

At the hearing, Ekster testified that he was a "bit overweight" and that he believed his weight impacted his back. He also testified that his most severe problem keeping him from working was his thoughts of hurting people or himself and that when he experienced anxiety, he could not control his schizophrenic and bipolar disorders. Regarding his feeling that he would hurt others, he explained that by being in public he felt uncomfortable, though he could not say that he would hurt anybody. Ekster testified about hearing voices and that the voices told him all the time to do something that was wrong. He said that he had previously listened to the voices which caused him to burn

down a house which then caused him to go to jail. He explained that he had medication for his mental health problems which helped him.

Ekster also testified that he had gout in both of his feet and that while it was better, there were times that his feet still hurt because of it. He explained that his gout would come and go and that it would be painful to the point that he would have to walk with a cane or wrap his foot. He testified that he had medication for his gout which his doctor wanted him to take every day, but he did not do so because he was afraid it would counteract with his other medications.

The ALJ also questioned the VE, beginning with the following hypothetical:

> Would you please assume the need to avoid concentrated exposure to fumes, odors, dust, gases, and other environmental irritants, as well as the need to avoid concentrated exposure to hazards such as dangerous machinery and unprotected heights. And that would be secondary to mental health symptoms. I would also like you to please assume that, because of mental impairments and symptoms combined, Mr. Ekster will have periods of symptom exacerbation resulting in moderate limitations in concentration, persistence, or pace when attempting complex or detailed tasks, and so he would need to be limited to jobs that do not involve complex or detailed job processes, with little in the way of change in job process from day to day and only occasional work interaction with coworkers, supervisors, and the public. With these limitations, could Mr. Ekster perform any of this past work?

AR 69. After obtaining the VE's negative answer, the ALJ asked whether, with the identified limitations, the hypothetical individual of Mr. Ekster's age, education, and work history would have other jobs available to him. AR 69-70. After the VE answered in the affirmative, the ALJ presented the VE with the further limitation that instead of work interaction occasionally with the public, the hypothetical individual would have no work interaction with the public. AR

71.  The ALJ also questioned whether the jobs identified by the VE would change if "even though it's okay to have occasional work interaction with . . . coworkers and supervisors, it's really more appropriate for the work to be independent rather than as a member of a team."  AR 71.  The VE responded that the jobs he cited were "pretty much independently performed."  AR 71.  The ALJ also asked the VE what the impact of the hypothetical individual likely missing two days of work or more per month would have on the jobs.  *Id*.  The VE stated missing that amount of work would result in lost employment.  AR 72.  Finally, the ALJ asked what the impact on the jobs would be where the hypothetical individual was off-task 20 percent of the day or more so that by the end of the day was not able to pick up pace and persistence "efficient" to make up for those lag periods.  AR 72.  The VE again responded that doing so would result in lost employment.  AR 72.

Lastly, the ALJ questioned Ekster's girlfriend, Jennifer Armstrong.

### III

In her Decision, the ALJ determined that Ekster had the following severe impairments:  gout, asthma, depression, anxiety, schizoaffective disorder, and drug and alcohol abuse.  The ALJ formulated Ekster's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium, light, and sedentary work as defined in 20 CFR 404.1567(c) and 416.967(c) except:  the claimant must avoid concentrated exposure to fumes, odors, dust, gases, and other environmental irritants and to hazards such as dangerous machinery and unprotected heights; because of his mental impairments and symptoms combined, he may during times of symptom exacerbation have moderate limitations in concentration, persistence, and pace when attempting complex or detailed tasks so he is limited to jobs that do not require complex or detailed job processes, little in the way of change in the job process from day to day, and independent work rather than work as a member of a team; and the claimant is limited to no more than occasional work

>interaction with coworkers and supervisors and no interaction with
>the general public.

AR 18. The ALJ discussed the record evidence that she considered in formulating the RFC including Ekster's and Armstrong's testimony. The ALJ additionally considered Ekster's medical records including ER records and his treating primary care physician Dr. Chad Conklin, M.D.'s notes. The ALJ also detailed the results of consultative psychological and physical examinations.

Throughout her Decision, the ALJ detailed Ekster's subjective complaints and comments pertaining to his gout and mental status made to Dr. Conklin and the ER, his medications, his use of cigarettes and alcohol, his x-ray results, his treatment gaps, his functional abilities upon examination, and his activities of daily living. The ALJ also discussed why she gave Dr. Conklin's opinion – that Ekster "would not be a good candidate for employment – "little weight," and why she gave "significant weight" to the State Agency medical opinions.

## IV

Ekster argues: 1) that the ALJ did not set forth a record basis for the mental functional capacity finding and rendered an independent medical determination; 2) that the ALJ did not properly assess the treating physician evidence; 3) that the ALJ's failure to consider obesity in combination with other impairments compels reversal; 4) that the ALJ erred by not assessing the need for a cane; 5) that the ALJ did not properly develop the record; and 6) that the ALJ made numerous credibility errors.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).

Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. §§ 404.1566, 416.966 (1986). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920. In the following order, the ALJ must evaluate whether the claimant:

    1)    currently performs or, during the relevant time period, did perform any substantial gainful activity;

    2)    suffers from an impairment that is severe or whether a combination of her impairments is severe;

> 3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;
>
> 4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and
>
> 5) is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, Ekster claims error on the ALJ's part at Step Four.

**A**

Ekster first argues that the ALJ did not identify medical or other evidence in support of the mental limitations set forth in her RFC finding or explain how she came up with those mental restrictions. He argues that the ALJ did not adopt any medical source opinion when crafting her RFC. Ekster further argues that while the ALJ found the state agency reviewing psychologists' opinions entitled to "significant weight," the ALJ did not adopt the limitations they set forth, address the limitations they set forth, or explain the omission of such limitations they set forth from her RFC. The Commissioner counters that Ekster

7

fails to appreciate that the ALJ rather than a medical source had the ultimate responsibility of assessing Ekster's RFC, and thus, it was not error for the ALJ to make an independent assessment of Ekster's mental limitations.

In her Decision, the ALJ expressly stated that, "The undersigned has given significant weight to the State Agency medical opinions (7F, 8F, 9F, 11F)." AR 23. The four cited Exhibits included a Psychiatric Review Technique form completed by Darrell Snyder, Ph.D. for the dates of October through December 2004, a Psychiatric Review Technique form completed by Dr. Snyder for the dates of February 2012 through present (May 2012), a Mental Residual Functional Capacity Assessment form (MRFCA) completed by Dr. Snyder dated May 9, 2012, and a Physical Residual Functional Capacity Assessment completed by Henry Rohs, M.D. dated May 14, 2012. The ALJ went on to state that, "The state agency assessment of the claimant's mental impairments is given significant weight but some additional restrictions have been given the claimant in consideration of evidence at the hearing level." AR 24.

An ALJ must "build an accurate and logical bridge from the evidence to her conclusion" so that the reviewing court may assess the validity of the agency's ultimate findings and "afford a claimant meaningful judicial review." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Here, the ALJ did so when she formulated Ekster's mental RFC. The ALJ gave the state agency reviewers' opinions "significant weight" and then made a mental RFC finding that reflected those opinions, particularly Dr. Snyder's as set forth in the narrative section (Section III) of the MRFCA form. In its entirety, the Section III narrative of the MRFCA form completed by Dr. Snyder stated:

> The claimant can understand, remember and follow instructions involving content that is basic and straightforward or moderately complex.

> He can sustain routine and repetitive tasks but is susceptible to occasional interrruptions [sic] from symptoms of depression, anxiety/panic and even antisocial behaviors sometimes emerging and affecting time on task.
> Uniformly, he would not be able to handle complex tasks.
>
> He could not tolerate average contact with the public, peers and supervisors but would need each contact limited to brief and superficial.
>
> He is unable to adapt to enhanced work productivity such as fast paced or high production quota conditions, and any frequent or significant changes in worksite.

AR 643. When Dr. Snyder's narrative is compared with the ALJ's mental RFC as set forth earlier in this Order and Opinion, the limitations that Dr. Snyder articulated are accounted for in the ALJ's mental RFC, albeit not stated in the exact same way.

As the Commissioner argues, an ALJ has the ultimate responsibility of assessing a claimant's RFC. 20 C.F.R. § 416.945 (a)(1). Also, the Regulations provide that an RFC is formulated after consideration of "all the relevant medical and *other evidence*." 20 C.F.R. § 416.945(a)(3) (emphasis added). Ekster does not cite to, and the Court has not found, authority that requires an ALJ to use the exact language in her RFC that was set forth in the narrative section of the MRFCA form. What *is* required is that an ALJ's RFC and hypothetical posed to the VE must incorporate all of the claimant's limitations supported by the medical record. *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). Thus, the Seventh Circuit Court of Appeals has explained that it is not necessary that the ALJ use the "precise terminology" of "concentration, persistence and pace." *Id. at 857* ("Although it is not necessary that the ALJ use this precise terminology ('concentration, persistence and pace') . . . ."); *O'Connor-Spinner v. Astrue*, 627

9

F.3d 614, 619 (7th Cir. 2010) ("We have not insisted . . . on a per se requirement that this specific terminology ('concentration, persistence and pace') be used in the hypothetical in all cases").

While the ALJ may not have used the precise language Dr. Snyder used, the ALJ fulfilled her obligation to incorporate all of Ekster's limitations that were supported by the medical record into the mental RFC she formulated. The ALJ discussed Ekster's medical evidence as well as the other evidence of record in her assessment of Ekster's RFC. The ALJ addressed Ekster's and his girlfriend's testimony, consultative psychological and physical examination results, opinion evidence, and Ekster's activities of daily living. That the ALJ gave "significant weight" to Dr. Snyder's opinion is obvious where the mental RFC finding so closely echoes Dr. Snyder's narrative in Section III of the MRFCA form. Notably, the ALJ *did* use the precise terminology in her RFC finding that because of Ekster's mental impairments and symptoms combined, he may during times of symptom exacerbation have "moderate limitations in concentration, persistence, and pace . . . ." AR 18. The Court can accordingly trace the path of the ALJ's reasoning in formulating the mental RFC. See *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate [her] assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning"). Substantial evidence supports the ALJ's RFC finding.

## B

Ekster also takes issue with particular parts of the ALJ's discussion of the record evidence which she used to formulate her RFC. Specifically, Ekster argues that the ALJ erroneously assessed the evidence provided by Ekster's treating physician, Dr. Conklin, failed to consider Ekster's obesity, failed to assess the need for a cane, and committed numerous credibility errors.

**1**

Ekster argues that the ALJ decided not to give controlling weight to Dr. Conklin without proffering a supportable rationale, and even if the ALJ had done so, the ALJ still would have been required to assess the weight in accordance with the checklist of factors outlined in the regulations. The Commissioner argues that the ALJ correctly considered Dr. Conklin's notes, and that the ALJ sufficiently considered the record evidence to conclude that Dr. Conklin's opinion was entitled to only "little weight."

Though an ALJ must give controlling weight to the medical opinion of a treating physician, the ALJ must do so only if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), *citing Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2); 20 C.F.R. §416.927(c)(3). If the ALJ does not give a treating physician's opinion controlling weight, the Social Security regulations require the ALJ to consider: 1) the length, nature, and extent of the treatment relationship; 2) the frequency of examination; 3) the physician's specialty; 4) the types of tests performed; 5) and the consistency and supportability of the physician's opinion. 20 CFR § 404.1527; 20 CFR § 416.927; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Had the ALJ's discussion of the weight she gave Dr. Conklin's opinion been limited to her statement that, "The undersigned has given little weight to this opinion as it is not supported by citation to any objective medical findings," that alone would warrant remand in this case. AR 23. It is the ALJ's duty, and not the treating physician's, to determine whether objective medical evidence of record as a whole supports a treating physician's opinion. *See* 20 C.F.R. § 416.927(c)(2) ("If *we* find that a treating source's opinion on the issue(s) of the

nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques . . . .") (emphasis added). However, the ALJ explained further her reasons for giving Dr. Conklin's opinion "little weight":

> Further, it is not consistent with the claimant's treatment history, which reflects no psychiatric hospitalizations and very sporadic treatment for his mental conditions, as well as noncompliance with his treatment recommendations including following up with the Human Service Center and taking his medications. Conclusions made by Dr. Conklin without corresponding medical findings are not given controlling weight under the principles set forth at 20 CFR 404.1527 and 416.927 and SSR 96-5p. More weight is given to the objective medical findings and reasonable limitations deduced therefrom. Therefore, the opinion of Dr. Conklin is not given controlling weight.

AR 23. Earlier in her Decision, the ALJ noted that Ekster presented to Dr. Conklin in October 2010 to establish care. AR 20. The ALJ also noted that "the record reflects only four visits with [Dr. Conklin] since his application date over two years ago." AR 22.

The ALJ did not commit error by giving Dr. Conklin's opinion only "little weight." Throughout her Decision, the ALJ identified the times that Ekster went to see Dr. Conklin and the information (directly from Ekster and from examination) that was obtained at those visits, including that Ekster was not able to get in to see a psychiatrist and what his complaints were at those visits. AR 21-23. Thus, it is clear that the ALJ considered the relevant factors under 20 C.F.R. § 416.927.

### 2

Next, Ekster argues that the ALJ erred by failing to consider his obesity and need for a cane. Ekster contends that the ALJ should have considered the additional walking and standing limitations from the combined impact of his

obesity with his gout and foot difficulties and that such errors are heightened because the ALJ mistakenly thought the agency reviewers had opined that Ekster had no severe physical impairments for the current time period. The Commissioner counters that the ALJ's failure to acknowledge Ekster's obesity in her Decision constituted harmless error because Ekster does not explain how his obesity limits his ability to work.

The ALJ's failure to expressly consider Ekster's obesity was harmless in this case. While SSR 02-1p provides that an ALJ should consider the effects of obesity together with underlying impairments, a failure to explicitly consider the effects of obesity may be harmless error. *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006); *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Here, the ALJ considered numerous records which noted Ekster's height and weight and noted that Ekster stated that he was overweight and his back hurt. Ekster does not point to any record evidence suggesting that his obesity exacerbated his physical impairment of gout or foot problems. He also does not specify how his obesity further impairs his ability to work. *Skarbek*, 390 F.3d at 504 ("Notably, Skarbek does not specify how his obesity further impaired his ability to work, but speculates merely that his weight makes it more difficult to stand and walk"). Ekster highlights his testimony where he stated that his obesity exacerbated his back pain. However, Ekster does not identify anywhere else in the record where he complained of back pain, so it is curious that he places so much reliance upon his testimony that does not even touch upon the impact of his obesity upon the impairments he alleged were actual impairments and *were* actually disabling (i.e. gout).

Ekster's argument regarding his need for a cane is that the ALJ erred by failing to evaluate his need for a cane, the record established that he used a cane that his treating physician prescribed in conjunction with gout complications,

and that *Thomas v. Colvin*, 534 F. App'x 546 (7th Cir. 2013), provides that a failure to properly address cane use is reversible error. The Commissioner argues that the ALJ's failure to evaluate Ekster's cane use was harmless error because Ekster does not show how that failure prejudiced him in any way, and there is no evidence that Dr. Conklin or any other medical source opined that Ekster had any limitations with regard to his ability to walk with or without an assistive device.

In *Thomas*, the Seventh Circuit agreed with the claimant that the ALJ's failure to address her need for a cane required remand. 534 F. App'x at 550. The *Thomas* court found the failure to require remand where the evidence of record included a doctor's note that the claimant "ambulate[d] with a cane for support and confidence," another doctor's notes described repeated falls by the claimant and the doctor's prescription for a cane, questionnaires submitted to the state agency explaining the claimant's need for a cane, reports of doctors noting her cane use, and the presence of the cane at the claimant's hearing and her testimony about why she needed it. *Id.*

Here, the "litany" of findings regarding the claimant's cane use in *Thomas* is not present. Significantly, there are no doctor's notes indicating that Ekster needed a cane for support or that he repeatedly fell, and there were no repeated references to Ekster's use of a cane. Instead, the record includes the prescription for Ekster's cane which stated, "walking cane [illegible] gout," Ekster's and Armstrong's reports that Ekster used a cane when his gout recurred, and Ekster's testimony at the hearing that his gout came and went and he at times had to walk with a cane or wrap his foot. AR 54, 193, 194, 203. The consultative psychological examination (cited by the ALJ) set forth that, "The claimant carried a cane in his right hand while on leaving was noted to walk with the aid of the cane but without discernable limp." AR 613. The ALJ also discussed the record

evidence in her Decision which indicated that Ekster had no problems ambulating without the use of an assistive device. As the Commissioner argues, there is no evidence that any medical sources opined that Ekster had limitations with regard to his ability to walk with or without an assistive device. Therefore, the ALJ did not commit reversible error because she failed to address Ekster's use of a cane.

### 3

Ekster's argument that the ALJ's numerous credibility errors require remand fails as well. He argues that the ALJ erred by drawing a negative inference from his treatment course without assessing the underlying reasons, by relying upon his daily activities to find he could perform work, and by failing to fully analyze the record evidence to assess his symptoms as required. The Commissioner counters that Ekster points to no evidence to suggest that his mental impairments or failure to afford treatment caused his noncompliance with recommended treatment, that the ALJ did not equate daily activities with the ability to perform full-time work, and that the ALJ was not required to address every piece of evidence in the record.

Determinations of credibility made by the ALJ will not be overturned unless the findings are patently wrong. *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012). SSR 96–7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." An ALJ must provide "enough detail and clarity to permit meaningful review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). A credibility finding "must be supported by the evidence and must be specific enough to enable the

claimant and a reviewing body to understand the reasoning." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

First, the ALJ *did* consider potential underlying reasons for Ekster's failure to pursue recommended treatment. The ALJ stated, "[Ekster] has not presented evidence that his mental impairments produced symptoms which caused him to avoid treatment." AR 23. Also, as the Commissioner argues, Ekster points to no evidence to suggest that his mental impairments or failure to afford treatment caused his noncompliance with recommended treatment. Particularly, Ekster points to nowhere in the record where he made reference to financial difficulties as the reason for failing to follow through with recommended treatment; he merely points out that in a separate case, the court pointed out that SSI is a disability benefit available only to persons who have no more than $2,000 in cash or the equivalent. *See Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (noting that the plaintiff in the case appeared to be indigent and informing the reader to remember that the claimant applied for SSI).

Second, the ALJ addressed Ekster's "actual functioning" including taking his son to the park, going shopping in stores, maintaining a relationship with his girlfriend, his reports of attending college, spending up to half of the day playing Xbox, and using the computer for email and Facebook. In regard to the evidence of college attendance, playing Xbox, and using the computer, the ALJ stated, "These clearly show an ability to maintain some form of concentration and persistence." AR 23. However, both before and after the ALJ addressed Ekster's daily activities, the ALJ discussed the other evidence of record, both medical and opinion. The ALJ considered properly considered Ekster's daily activities insofar as they pertained to the question of his credibility.

Lastly, the ALJ's Decision is replete with references to various records bearing upon the issue of the extent of Ekster's symptoms. Ekster isolates just

one alleged failure – the ALJ's failure to properly consider Ekster's use of strong pain medications. However, Ekster cites to two records identifying his pain medications of Vicodin and Norco which the ALJ cited to as well in her Decision. She specifically discussed that Ekster "was given a short term supply of Norco . . . ." AR 21. The ALJ provided enough clarity and detail to permit the Court's meaningful review of her credibility determination; the detail provided shows that she considered the entire case record and provided specific reasons for her credibility determination. *See Briscoe ex rel. Taylor*, 425 F.3d at 351; SSR 96-7p. As a result, the Court does not find that the ALJ's credibility determination was patently wrong.

### C

Finally, Ekster argues that the Commissioner has the burden to demonstrate that the ALJ met the enhanced standard to fully and fairly develop the record because the ALJ did not ensure a valid waiver of counsel. Ekster contends that the ALJ failed in her duty by not re-contacting Dr. Conklin to fill the evidentiary gap created by the ALJ choosing not to rely on any opinion evidence in constructing the RFC, failed to fully question the VE, and failed to ask the VE if his testimony conflicted with the Dictionary of Occupational Titles (DOT). The Commissioner disputes that it failed to obtain a valid waiver, arguing instead that the ALJ confirmed at the hearing that Ekster received information from the Agency regarding his right to representation. The Commissioner also argues that Ekster fails to identify the alleged evidentiary gap.

At the hearing, the following colloquy between the ALJ and Ekster occurred regarding professional representation of Ekster:

> ALJ: . . . I see you come today without a professional representative. On a couple of occasions, sir, we sent you

> information about the right of representation. Do you remember getting that from us?
> CLMT: Yes.
> ALJ: Are you prepared to go forward today without a representative?
> CLMT: Yes.

AR 33-34. Elsewhere in the record, as the Commissioner points out, is a letter and attachments, including the "Your Right To Representation" form which Ekster testified that he had received. AR 115-22.

An ALJ has a "basic obligation to develop a full and fair record," which is particularly so where the claimant is unrepresented by counsel so that the ALJ has a duty to "scrupulously and conscientiously probe into, inquire of, and explore all relevant facts." *Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir. 1997) (internal citations omitted). However, how much evidence to gather is typically left to the reasoned judgment of the Commissioner, and a significant omission is usually required before the court will find that the Commissioner failed to assist a *pro se* claimant in developing the record fully and fairly. *Luna v. Shalala*, 22 F.3d 687, 692 (7th Cir. 1994). Where an ALJ does not obtain a valid waiver, the burden is on the [Commissioner] to show the ALJ adequately developed the record. *Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994). In *Binion*, the Seventh Circuit detailed that to ensure a valid waiver of counsel, an ALJ was required to explain to the pro se claimant: 1) the manner in which an attorney can aid in the proceedings; 2) the possibility of free counsel or a contingency arrangement; and 3) the limitation on attorney fees to 25 percent of past due benefits and required court approval of the fees. *Id.*

Here, Ekster argues that the ALJ did not discuss any of the items the Seventh Circuit has held an ALJ must explain to a *pro se* claimant (citing *Binion*), and the Commissioner argues that lower courts have held that a claimant's

receipt of the "Your Right To Representation" form satisfies the Seventh Circuit's standard set forth in *Binion*. Even assuming that the ALJ did not obtain a valid waiver by failing to explain the three items included in the Seventh Circuit's standard for valid waiver, the Commissioner has sustained its burden to show that the ALJ adequately developed the record. Ekster's argument that the ALJ failed to fully and fairly develop the record is grounded, in part, upon her previous arguments that the ALJ had no record basis for the mental RFC. The Court has already determined that the ALJ committed no error in formulating Ekster's mental RFC. The mental RFC was sufficiently supported by the record evidence and so the ALJ did not err by failing to recontact Dr. Conklin to fill an "evidentiary gap." Furthermore, because the mental RFC was sufficiently supported and correctly included all limitations supported by the medical record and because the hypotheticals posed to the VE included the restrictions set forth in the ALJ's mental RFC, the ALJ did not fail to fully question the VE at the hearing. *See Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009) ("Ordinarily, an ALJ's hypothetical questions to a VE must include all limitations supported by medical evidence in the record") (internal citation omitted); *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) ("In this circuit, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record") (internal citation omitted).

While Ekster correctly argues that the ALJ erroneously failed to ask the VE if his testimony conflicted with the DOT as required by SSR 00-4p, such an error is harmless unless there actually was a conflict. *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009). Ekster does not argue that there was a conflict, and so the Court will proceed no further on this issue. Additionally, Ekster did not sufficiently develop his argument that not all of the job numbers cited in the Decision

correspond with the VE's testimony.  That argument, too, requires no further discussion.

V

For the reasons stated above, Ekster's Motion for Summary Judgment (Doc. 18) is DENIED and the Commissioner's Motion for Summary Affirmance (Doc. 22) is GRANTED.  This matter is now terminated.

*It is so ordered.*

Entered on January 14, 2016.

s/Jonathan E. Hawley<br>
U.S. MAGISTRATE JUDGE